**Affirmed and Memorandum Opinion filed August 30, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-18-00218-CV

## IN THE INTEREST OF R.V.P. AND B.G.B. A/K/A B.P., CHILDREN

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2017-00805J**

## M E M O R A N D U M   O P I N I O N

Appellant R.P. (Mother) appeals the trial court's final decree terminating her parental rights and appointing the Department of Family and Protective Services as sole managing conservator of her children, R.V.P. (Raphael) and B.G.B (Barry).[1] The trial court terminated Mother's rights on the predicate grounds of endangerment, constructive abandonment, and failure to comply with a family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (N), & (O) (West Supp. 2017). The trial

---

[1] We use pseudonyms to refer to the children. *See* Tex. R. App. P. 9.8.

court further found that termination of Mother's rights was in the children's best interest, and named the Department managing conservator of the children. The children have different fathers. The trial court terminated both fathers' rights on the ground that they failed to respond to the Department's petition by timely filing an admission of paternity or counterclaim on the issue of paternity. The fathers have not appealed the termination of their parental rights.

In two issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding on the predicate ground of constructive abandonment, and the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Pretrial Proceedings

#### 1.  Removal Affidavit

The Department received a referral alleging medical neglect, neglectful supervision, and physical neglect of Raphael, 6 years old, and physical neglect, and neglectful supervision of Barry, 4 years old. The report stated that Mother was living in a home with mold that was adversely affecting Raphael's asthma. The report also stated that Mother does not have the children enrolled in school, the children have not been in school, and have been living from home to home along with Mother. The report alleged that Mother was using illegal drugs while the children were in her care. Mother has history with the Department resulting in Mother previously having to complete services.

#### 2.  The Investigation

Department investigators contacted Mother, who reported that she was not living in the home with mold. Mother reported that both children were enrolled in

school, but were not attending because their immunizations were not up to date. Mother told the investigator that she had lived with her mother (Grandmother) for a time, but was "kicked out" of the house when her mother "caught up on some bills." Mother then lived with her father (Grandfather) for a time, but moved out when her father's wife no longer wanted Mother and the children to live with them. Mother admitted to a history with the Department and prior drug use. She claimed not to be using drugs or alcohol at the time the children were removed.

The investigator noted that the children were dressed appropriately for age, weight, and size. They appeared to be clean and there was no sign of developmental delays. The children were shy and were comforted by Mother when the investigator tried to take a picture of them.

A family friend agreed to be a "safety monitor" while the Department awaited the results of Mother's drug tests. Mother and the children were to stay with the family friend pending the Department's investigation. When the family friend left his home to run an errand, he returned to find that Mother had left with the children. The family friend reported that he had tried to assist Mother with food and help getting the children's immunizations, but Mother had run away when he had tried to help. The family friend had allowed Mother and her children to live with him before, but did not think Mother wanted to be helped. Mother frequently brought strange men and other people to his home. The family friend suspected Mother was using drugs.

The investigator was unable to contact Mother after this incident until January 8, 2017, over a month after the initial referral. Mother called the investigator and said she would report for a drug test the next day. Mother did not appear for the drug test. The following day Mother submitted to a urine test, which was negative. Mother initially refused a hair follicle test, but submitted to a hair follicle test on January 23,

2018, almost two weeks later. The hair follicle test was positive for marijuana and cocaine.

Approximately two weeks later the investigator received a phone call from Mother accusing the family friend of requiring sex in exchange for living in his home. Mother gave the investigator two other names of potential placements for the children. One person had a criminal history, but the other person agreed to take the children. However, the other adults who lived in the house with that person would not agree to take the children.

The Department requested to be named temporary managing conservator of the children because Mother tested positive for marijuana and cocaine. The Department alleged Mother was unable to provide a stable and safe living environment for the children and that it was not in their best interest to remain in the home.

The trial court entered a temporary order removing the children, naming the Department temporary managing conservator, and ordering drug and alcohol screening for Mother.

### 3. Family Service Plan

The Department entered into a family service plan with Mother, which noted that Mother had failed to provide protection and safety for the children, was known to use drugs, and had allowed the children to live in a home with mold and possible drug use. The trial court signed an order on March 30, 2017, that approved the service plan and made it an order of the court. The plan required Mother to:

- complete parenting classes in person six to eight weeks in length and provide a certificate of completion to the agency;
- acquire and maintain a legal form of employment and provide documentation in the form of a paycheck stub to the caseworker;

4

- submit to a psychosocial assessment and follow all recommendations from the assessment;

- refrain from engaging in any criminal activities;

- submit to random urinalysis or hair follicle drug testing and test negative at all times;

- make all efforts to attend court hearings, permanency conferences, family visits, and scheduled appointments;

- acquire and maintain stable housing for more than six months; and

- participate fully in a drug and alcohol assessment.

## B.    Trial Testimony

At the beginning of trial the Department introduced documentary evidence in the form of the returns on service, children's birth certificates, DNA testing on potential fathers, the removal affidavit, temporary orders following the adversary hearing, record of the status hearing, family service plans, drug test results, Mother's criminal record, Mother's Children's Crisis Care Center (4 C's) assessment, a permanency plan, and permanency progress report. Mother objected to the admission of the removal affidavit and the 4 C's assessment as hearsay, the court orders because the court could take judicial notice of its own orders, and the conviction as being remote. The Department withdrew its proffer of the court orders, and the court sustained Mother's objection to the removal affidavit. Mother's other objections were overruled.

The returns on citation, birth certificates, family service plans, drug test results, criminal records, 4 C's assessment, and permanency report were admitted into evidence.

The caseworker's supervisor[2] testified that the children, ages five and seven

_____

[2] On cross-examination, the supervisor explained that the primary caseworker had recently

5

at the time of trial, were placed in a foster-to-adopt home. According to the caseworker, the foster family is meeting all of the children's needs. During the caseworker's testimony the trial court admitted the removal affidavit. Early after the children were removed Mother tested positive for cocaine. On January 23, 2017, Mother tested positive for marijuana and cocaine. One month later, on February 23, 2017, Mother tested positive for benzoylecgonin, cocaine, and marijuana. Mother was asked to submit to drug tests at hearings scheduled March 31, 2017, June 29, 2017, and September 20, 2017, but she did not appear for any of those drug tests. Mother was told that a failure to appear at a drug test would count as a positive result.

Mother failed to follow the recommendations of the psychosocial evaluation, and failed to complete parenting classes, individual therapy, or domestic violence classes. Mother did not regularly visit the children. Mother also has a prior conviction for theft.

The supervisor testified that it was in the children's best interest to terminate their parents' rights because the parents had not remained drug free and were unable to ensure that their children would be in a safe and stable environment. The children have adjusted to their foster family and have become part of a family unit. The children have become familiar with what is expected of them with regard to their education and privileges they have in the home. They are understanding boundaries and the consequences of exceeding the boundaries in the household.

Mother testified that she had used Xanax and marijuana in the past, but had not used cocaine. Mother could not explain why she tested positive for cocaine. Mother was unemployed at the time of trial, but pays bills with the help of friends

---

taken family medical leave. The caseworker worked with the family until approximately one week before trial. The supervisor read the case file and supervised the caseworker while the case was pending.

6

and family. Mother testified that she participated in group counseling and submitted to a psychosocial assessment. Mother asked that her rights not be terminated and that the children be placed with her father. In the 4 C's assessment Mother reluctantly admitted that she was living with a man who was physically abusing her.

Grandfather testified that he and his wife have a stable home in Virginia. Grandfather asked the court to place the children with him and his wife. Grandfather testified that he has a relationship with the children. Grandfather explained that he had a previous case eight years earlier with the Child Protection Service in Virginia. Grandfather said his wife called the police because he verbally abused his son. Grandfather also admitted hitting his son and pushing him when his son was 13 years old. Grandfather was charged with assault and battery and received probation similar to deferred adjudication. Grandfather completed his services in Virginia and did not lose parental rights to his son. Grandfather said that he has learned through anger management classes how to control his anger.

The trial court found clear and convincing evidence that termination of Mother's rights was warranted under section 161.001(b)(1)(E) (endangerment), (N) constructive abandonment, and (O) (failure to follow the family service plan), and that termination was in the best interest of the children.

## II.   ANALYSIS

In two issues Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding of constructive abandonment under subsection N and the factual sufficiency of the evidence to support the best-interest finding. Mother does not challenge the trial court's findings under subsection E (endangerment) or subsection O (failure to follow the family service plan). Because Mother's parental rights can be terminated with a finding of best interest of the child and any one of the three section 161.001(b)(1) grounds, we need not address

Mother's first issue challenging the trial court's finding on the predicate ground of constructive abandonment. *See In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

## A. Standard of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or

conviction, then the evidence is factually insufficient." *Id*. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B. Best Interest of the Children

In her second issue, Mother challenges the factual sufficiency of the evidence to support the trial court's finding that termination is in the best interest of the children.

The factors the trier of fact may use to determine the best interest of the child include: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re U.P.*, 105 S.W.3d at 230; *see also* Tex. Fam. Code Ann. § 263.307(b) (West Supp. 2017) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the children is served by keeping the children with their natural parents, and the burden is on the Department to rebut that presumption. *In re U.P.*, 105 S.W.3d at 230. Prompt and permanent placement in a safe environment also is presumed to be in the children's best interest. Tex. Fam. Code Ann. § 263.307(a).

In reviewing the sufficiency of the evidence to support the trial court's finding

on best interest we are mindful that the focus in a best-interest analysis is not only on the parent's acts or omissions, but on the nature of the relationship the child has with the parent. *In re E.N.C.*, 384 S.W.3d 796, 808 (Tex. 2012). Therefore, in analyzing whether termination of Mother's parental rights is in the children's best interest, we focus on the evidence regarding the nature of the relationship between Mother and her children.

1.      *Desires of the children*

At the time of trial the children were five and seven years old. When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent. *In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). Mother argues the children were old enough to express their desires, but were not heard from at trial. This court has previously determined that a seven-year-old may not be old enough to express his or her desires with regard to the parents. *See In re Z.N.M.*, No. 14-17-00650-CV; 2018 WL 358480 at *8, (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.); *see also In re K.P.C.*, No. 14-17-00993-CV, 2018 WL 2106669 at *10–11 (Tex. App.—Houston [14th Dist.] 2018, no pet. h.) (mem. op.) (holding that children ages five, six, and eight were not old enough to express their desires).

The record reflects the children are in a foster-to-adopt home. The children have adjusted to their foster family and have become part of a family unit. They have become familiar with what is expected of them with regard to their education and privileges they have in the home, and are understanding boundaries and the consequences of exceeding the boundaries in the household.

2.      *Present and future physical and emotional needs of the children*

Regarding this factor, we note that the need for permanence is a paramount

10

consideration for the children's present and future physical and emotional needs. *See In re D.R.A.*, 374 S.W.3d at 533. The goal of establishing a stable, permanent home for a child is a compelling government interest. *Id.*

While some children may have extraordinary physical and emotional needs requiring extra care, all children have physical and emotional needs that must be met on a daily basis. The record reflects that the children do not have extraordinary needs. With regard to the children's emotional and physical needs, evidence shows that Mother has not provided for the children's past or present physical and emotional needs.

Mother argues that the evidence shows she was the children's primary caregiver and she was doing an appropriate job of caring for them. Mother also argues the children were bonded with her. Despite Mother's arguments, the record reflects Mother was involved in a physically abusive relationship, did not have stable employment, and continued to use illegal drugs even after her children were removed. A fact finder may infer from a parent's past inability to meet the child's physical and emotional needs an inability or unwillingness to meet the child's needs in the future. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

3. *Present and future physical and emotional danger to the children*

With regard to this factor we note that Mother continued inappropriate behaviors including her activities involving illegal drugs, as well as her unhealthy relationships that involved domestic violence, subjecting her children to an uncertain future that endangered her children's safety and stability. *See In re J.O.A.*, 283 S.W.3d at 345. Evidence of a parent's unstable lifestyle can also support the conclusion that termination is in the child's best interest. *In re A.R.M.*, No. 14-13-01039-CV, 2014 WL 1390285, at *10 (Tex. App.—Houston [14th Dist.] Apr. 8,

11

2014, no pet.) (mem. op.). "Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child." *See In re B.Z.S.*, No. 14-16-00825-CV, 2017 WL 536671, at *5 (Tex. App.—Houston [14th Dist.] Feb. 9, 2017, pet. denied) (mem. op.).

4. *Parental abilities of those seeking custody, stability of the home or proposed placement, and plans for the child by the individuals or agency seeking custody*

These factors compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination of the parent-child relationship. *See In re D.R.A.*, 374 S.W.3d at 535.

Mother continued to use drugs and live in an unstable environment after the children were removed from her care. Mother contends the Department has an obligation to "look at any viable family members as possible placements for children in its care." Mother argues that Grandfather is willing to take the children and the Department has not sufficiently investigated Grandfather as a potential placement.

In enabling the Department to give preference to a relative of the child if placement with the noncustodial parent is inappropriate, the trial court has broad discretion in determining the best interest of the child. *See In re S.P.*, 168 S.W.3d 197, 211 (Tex. App—Dallas 2005, no pet.). The determination of where a child will be placed is a factor in determining the child's best interest, but the fact that placement will be with non-relatives is not a bar to termination. *In re A.L.*, 389 S.W.3d 896, 902 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

The record reflects that Mother reported physical abuse by Grandfather, and Grandfather admitted physical abuse of his son who currently lives with him. The Department can conduct a home study on Grandfather before permanently placing

12

the children. Termination of Mother's parental rights does not prevent the Department from considering Grandfather as a potential placement. *See id.*

### 5. *Programs available to assist in promoting the children's best interest*

In determining the best interest of the children in proceedings for termination of parental rights, the trial court may properly consider that the parent did not comply with the court-ordered service plan for reunification with the children. *See In re E.C.R.*, 402 S.W.3d at 249. The caseworker's supervisor testified that Mother failed to complete her family service plan. Although Mother contends she completed some services, the evidence established that she did not fully complete the plan. Mother offered no excuse for failure to complete the plan.

Mother's failure to complete the court-ordered service plan demonstrates that she is unwilling to take advantage of the services offered to her by the Department and casts doubt on her parenting abilities. *See In re I.L.G.*, 531 S.W.3d 346, 355–56 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); Tex. Fam. Code § 263.307(b)(10), (11).

### 6. *Acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate, and any excuse for the parent's acts or omissions*

As noted above, Mother did not offer excuses for failure to complete the family service plan. Mother admitted use of marijuana and Xanax, but denied using cocaine despite a positive test result. Mother's pattern of conduct reflects that termination is in the best interest of the child.

In view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(2). Accordingly, we conclude the evidence is factually sufficient to support the trial court's best-interest finding.

We overrule Mother's second issue.

### III. CONCLUSION

Based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Mother's parental rights was in the children's best interest so they could achieve permanency through adoption. *See In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

We affirm the decree terminating Mother's parental rights and naming the Department managing conservator.

/s/     Marc W. Brown
Justice

Panel consists of Chief Justice Frost and Justices Donovan and Brown.